# EXHIBIT A

**EMPLOYMENT AGREEMENT**

This EMPLOYMENT AGREEMENT (the "Agreement") is made as of this 21st day of December, 2018, by and between Scott Sidell (the "Employee") and 777 Partners LLC (the "Company").

**W I T N E S S E T H:**

**WHEREAS**, the Company desires to employ Employee and to enter into this Agreement embodying the terms of such employment, and Employee desires to enter into this Agreement and to accept such employment, subject to the terms and provisions of this Agreement.

**NOW THEREFORE**, in consideration of the promises and the mutual covenants and agreements hereinafter set forth, the parties, intending to be legally bound, agree as follows:

1. **Employment and Acceptance**. The Company shall employ Employee, and Employee shall accept such employment, subject to the terms and conditions of this Agreement, commencing on the date hereof (the "Start Date") and terminating on the 3rd anniversary of the Start Date, unless this Agreement and Employee's employment is terminated earlier in accordance with the terms of this Agreement or renewed as provided in the immediately following sentence. On the third anniversary of the start date and each anniversary thereafter, this Agreement shall be automatically renewed for additional term of twelve (12) months unless the Company or Employee delivers a written notice to the other of its intent not to renew this Agreement at the end of the then applicable term, which written notice shall be delivered no later than thirty (30) days prior to the end of such term.

2. **Duties and Title**. Employee shall serve as Principal and Head of Alternative Energy and Infrastructure Investments for the Company, and in such capacity, shall have the duties, responsibilities, functions and authority that are normally associated with such position. Employee shall devote his best efforts and substantially all of his business time, skill and attention to all facets of the business of the Company and will faithfully perform his duties, responsibilities and functions hereunder to his ability in a diligent and professional manner. Employee shall not engage in any activity that (x) conflicts with the interests of the Company or any of its subsidiaries, parents or affiliates (collectively, the "Company Group"), (y) interferes with the proper and efficient performance of Employee's duties for the Company, or (z) interferes with Employee's exercise of judgment in the Company's best interests. Employee agrees to serve as an officer and/or director of such other companies constituting part of the Company Group as the Company may direct, in each case, without additional compensation.

3. **Location**. Employee shall perform his duties in the New York metropolitan area; provided that, Employee will be required to travel to the Company's offices in Miami, Florida to perform his duties as reasonably necessary or requested by the Company.

4. **Compensation**.

    (a) **Base Salary**. Employee shall be entitled to an annualized base salary of $250,000 per year ("Base Salary"), payable in accordance with the regular payroll practices of the Company.

(b) **Discretionary Bonus**. Employee shall be eligible for an annual incentive bonus award determined by the Company in respect of each calendar year during Employee's employment (the "Discretionary Bonus"). The target Discretionary Bonus for each calendar year shall be targeted to be $100,000, with the actual Discretionary Bonus payable being based upon the level of achievement of annual Company performance objectives and annual individual performance objectives for such calendar year. Subject to Section 4(c) below, the Discretionary Bonus shall be paid to Employee at the same time as annual bonuses are generally payable to other senior employees of the Company, subject to Employee's continuous employment through the payment date and not having given notice of resignation, but in no event later than 60 calendar days following the conclusion of the calendar year for which the bonus is attributable. Employee's receipt of a Discretionary Bonus at any time will not be construed as creating any expectation of or entitlement to any future bonus.

(c) **Advances Against the Discretionary Bonus**. To the extent that third parties engage the Company to perform certain services and such third parties pay a retainer to the Company, then seventy-five percent (75%) of all such retainers, up to an aggregate of $100,000, shall be paid to Employee as an advance against the Discretionary Bonus, which payment shall be made within ten (10) days after the Company is paid such retainer in immediately available funds that are not subject to any refund or claw back by a third party. Employee's Discretionary Bonus for any year shall be at least equal to the amounts advanced to Employee pursuant to this Section 4(c) during such year. To the extent that Employee's Discretionary Bonus for any year is greater than the amounts advanced to Employee pursuant to this Section 4(c) during such year then such excess shall be paid in accordance with Section 4(b).

(d) **Net Profit Bonus.** Employee will be eligible to receive a bonus in an amount equal to 20% of all fees, commissions, and trading profits, net of related expenses, related allocated overhead and related costs (including but not limited to cost of capital), and related taxes ("Net Profit Bonus"), that result from any transactions which are principally the result of Employee's efforts or the efforts of employees of the Company (or affiliates of the Company assigned to work for the Company) working under the direct supervision of Employee.

(e) **Company Bonus Program**. Employee shall be eligible to participate in the bonus program of the Company, as soon as practicable after it is launched, pursuant to which employees of the Company and its affiliates are entitled to receive bonuses based on amounts distributable by the Company to its members.

(f) **Benefits**. Employee shall be eligible to participate in any and all employee benefit plans made available to other similarly-situated employees of the Company. Employee shall also be entitled to the same number of holidays, vacation days, and sick days, as well as any other benefits, in each case as are generally allowed to similarly-situated employees of the Company in accordance with the Company policy as in effect from time to time. The Company may alter, modify, add to or delete any employee benefit maintained for the Company's employees generally at any time.

(g) **Travel Expenses.** The Company shall reimburse Executive for all reasonable, customary, and necessary expenses, including travel (including travel to and from the Company's principal office) and entertainment expenses, incurred in the performance of

DOC ID - 26568928.2                                2

Executive's duties for the Company. Executive shall first account for such expenses in accordance with the policies and procedures set by the Company from time to time for reimbursement of such expenses. The amount, nature, and extent of such expense reimbursement shall always be subject to the control, supervision, and direction of the Company.

      5.      **Termination**.

      (a)      General. The Employee's employment with the Company's may be terminated by the Employee or by the Company at any time, for any reason (the effective date such termination of employment, the "Separation Date"). Upon any termination of Employee's employment for any reason, except as may otherwise be requested by the Company in writing and agreed upon in writing by Employee, Employee shall resign from any and all directorships, committee memberships, and any other positions Employee holds with the Company and any member of the Company Group. The payment (or commencement of a series of payments) hereunder of any "nonqualified deferred compensation" (within the meaning of Section 409A of the Code) upon a termination of employment shall be delayed until such time as Employee has also undergone a "separation from service" as defined in Treas. Reg. 1.409A-1(h), at which time such nonqualified deferred compensation (calculated as of the date of Employee's termination of employment hereunder) shall be paid (or commence to be paid) to Employee on the schedule set forth in this Section 5 as if Employee had undergone such termination of employment (under the same circumstances) on the date of Employee's ultimate "separation from service." Notwithstanding any provisions to the contrary in this subsection, any Net Profit Bonus that would have become due and owing to Employees within 60 days of Separation Date, by virtue of an actual financial closing or an applicable transaction within 60 days of said Separation Date, will result in payment by Company to Employee of the respective Net Profit Bonus ("Separation Net Profit Bonus").

      (b)      Termination Due to Death or Disability. Employee's employment shall terminate automatically upon Employee's death. The Company may terminate Employee's employment immediately upon the occurrence of a Disability, such termination to be effective upon Employee's receipt of written notice of such termination. "Disability" shall mean any physical or mental disability or infirmity of Employee that prevents the performance of Employee's duties for a period of (i) 90 consecutive days or (ii) 120 non-consecutive days during any 12-month period. Upon Employee's death or in the event that Employee's employment is terminated due to Employee's Disability, Employee or Employee's estate or Employee's beneficiaries, as the case may be, shall be entitled to:

      (i)      all accrued but unpaid Base Salary, Net Profit Bonus, and Separation Net Profit Bonus through the Employee's Separation Date;

      (ii)      any unpaid or unreimbursed business expenses incurred in accordance with the Company's business expense policy;

      (iii)      any benefits provided under the Company's employee benefit plans upon a termination of employment, in accordance with the terms contained therein ((i), (ii) and (iii), collectively, the "Accrued Obligations"); and

(iv) any earned but unpaid Discretionary Bonus in respect of any completed calendar year that has ended prior to the Separation Date, which amount shall be paid at such time discretionary bonuses are paid to other employees of the Company, but in no event later than the date that is two and one-half months following the later of the last day of the fiscal year in which the Separation Date occurred or the calendar year in which the Separation Date occurred (the "Unpaid Discretionary Bonus").

Following Employee's death or a termination of Employee's employment by reason of a Disability, except as set forth in this Section 5(b), Employee shall have no further rights to any compensation or any other benefits under this Agreement.

(c) Termination by the Company with Cause. The Company may terminate Employee's employment at any time with Cause, effective upon Employee's receipt of written notice of such termination. "Cause" shall mean the Employee's: (1) repeated failures to perform Executive's duties; (2) willful refusal to comply with one or more lawful directives of the Company; (3) material breach of this Agreement or the Limited Liability Company Agreement of the Business Entity; (4) misconduct, including but not limited to, use or possession of illegal drugs during work and/or any other action that is damaging or detrimental to the reputation or business affairs of the Company; (5) violation of the Company's policies, including those concerning discrimination or harassment in the workplace or workplace ethics; (6) conviction of, or plea of guilty or *nolo contendere* to, a felony or a misdemeanor requiring jail time; (7) failure to cooperate with, or any attempt to obstruct or improperly influence, any investigation authorized by the Board of Directors or any governmental or regulatory agency; or (8) misrepresentation, fraud, breach of fiduciary duty, or other similar conduct involving Executive's duties or conduct concerning the Company; *provided that* with respect to clauses (3)–(5) above, such breach or failure is not cured after written notice from the Company and a 10 day cure period, provided that such breach is capable of cure; *provided however* any instances of discrimination or harassment will not be capable of cure. Following such termination of Employee's employment with Cause, Employee shall have no further rights to any compensation or any other benefits under this Agreement.

(d) Termination by the Company without Cause. The Company may terminate Employee's employment at any time without Cause, effective upon Employee's receipt of written notice of such termination. In the event that Employee's employment is terminated by the Company without Cause (other than due to death or Disability), Employee shall be entitled to:

(i) The Accrued Obligations;

(ii) the Unpaid Discretionary Bonus; and

(iii) the Employee's then-Base Salary for a period of twelve (12) months.

Notwithstanding the foregoing, the payments and benefits described in clauses (ii) and (iii) above shall immediately terminate, and the Company shall have no further obligations to Employee with respect thereto, in the event that Employee breaches any of Employee's continuing obligations under this Agreement. Following such termination of Employee's employment by the Company without Cause, except as set forth in this Section 5(d), Employee shall have no further rights to

any compensation or any other benefits under this Agreement. For the avoidance of doubt, Employee's sole and exclusive remedy upon a termination of employment by the Company without Cause shall be receipt of the Severance Benefits (as defined below).

(e) <u>Termination by Employee</u>. Employee may terminate Employee's employment for any reason by providing the Company with 20 days' advance written notice of such termination. In the event of a termination of employment by Employee under this Section 5(e), Employee shall be entitled only to the Accrued Obligations. In the event of termination of Employee's employment under this Section 5(e), the Company may, in its sole and absolute discretion, by written notice accelerate such date of termination. Following such termination of Employee's employment by Employee, except as set forth in this Section 5(e), Employee shall have no further rights to any compensation or any other benefits under this Agreement.

(f) <u>Release</u>. Notwithstanding any provision herein to the contrary, the payment of any amount or provision of any benefit pursuant to 5(b) or 5(d) other than Accrued Obligations (collectively, the "<u>Severance Benefits</u>") shall be conditioned upon Employee's execution, delivery to the Company, and non-revocation of a release of claims (and the expiration of any revocation period contained in such release of claims) in a form acceptable to the Company in its sole discretion (a "<u>Release of Claims</u>"), within 60 days following the Separation Date. If Employee fails to execute a Release of Claims in such a timely manner so as to permit any revocation period to expire prior to the end of such 60-day period, or timely revokes Employee's acceptance of such Release of Claims following its execution, Employee shall not be entitled to any of the Severance Benefits. Further, (i) to the extent that any of the Severance Benefits constitutes "nonqualified deferred compensation" for purposes of Section 409A of the Code, any payment of any amount or provision of any benefit otherwise scheduled to occur prior to the 60th day following the Separation Date, but for the condition on executing a Release of Claims as set forth herein, shall not be made until the first regularly scheduled payroll date following such 60th day and (ii) to the extent that any of the Severance Benefits do not constitute "nonqualified deferred compensation" for purposes of Section 409A of the Code, any payment of any amount or provision of any benefit otherwise scheduled to occur following the Separation Date, but for the condition on executing the Release of Claims as set forth herein, shall not be made until the first regularly scheduled payroll date following the date the Release of Claims is timely executed and the applicable revocation period has ended, after which, in each case, any remaining Severance Benefits shall thereafter be provided to Employee according to the applicable schedule set forth herein. For the avoidance of doubt, in the event of a termination due to Employee's death or Disability, Employee's obligations herein to execute and not revoke the Release of Claims may be satisfied on Employee's behalf by Employee's estate or a person having legal power of attorney over Employee's affairs.

6. **Confidential Information**. The Company and Employee agree that Employee will have access to, Confidential Information in the course of his employment with the Company. During Employee's employment and thereafter, Employee shall not, directly or indirectly, use for Employee's own purpose or for the benefit of any person or entity other than the Company, disclose, provide access to, or publish any Confidential Information to any individual or entity, unless such disclosure has been authorized in writing by the Company's Board of Managers or is otherwise required by law. For purposes of this Agreement, the term "<u>Confidential Information</u>" means non-public confidential, proprietary or trade secret information

concerning the Company or its business operations of which Employee has knowledge, including, without limitation: (a) information regarding customers and prospective customers of the Company Group and information concerning the transactions or relations of any customer or prospective customer of the Company Group, (b) information concerning any product of, or technology or procedure employed by, the Company Group but not generally known to its customers, prospective customers, vendors or competitors, or any product under development by or being tested by the Company Group but not at the time offered generally to customers or vendors, (c) information relating to the Company Group's computer software, computer systems, pricing or marketing methods, sales margins, cost of goods, cost of material, capital structure, operating results, borrowing arrangements, or business plans, (d) any information which is generally regarded as confidential or proprietary in any line of business engaged in by the Company Group, (f) inventions, innovations or improvements covered by Section 7 below, (g) plans or strategies related to the acquisition or disposition of any business or portion of any business of the Company, or strategic ventures considered or anticipated to be entered into by the Company Group, (h) financial information relating to the Company Group, its financial condition or financial statements, (i) information related to the compensation of Employees, consultants, agents or representatives of the Company Group, other than Employee's own compensation, (j) all written, graphic and other material relating to any of the foregoing, and (k) any information provided to Employee by the Company Group which was indicated by the Company Group to be Confidential Information, or any information which a reasonable person would expect to be considered Confidential Information. In the event that Employee is required by law to disclose any Confidential Information, Employee will promptly notify the Company in writing so that the Company may seek a protective order and/or file any other motion to prevent the production or disclosure of Confidential Information. If such motion has been denied, then Employee may disclose only such portion of the Confidential Information which is required by law to be disclosed or the Company consent, in writing, to having disclosed, provided that, Employee will use reasonable efforts to preserve the confidentiality of the remainder of the Confidential Information.

7. **Inventions, Patents and Other Intellectual Property**. All inventions, innovations or improvements in the Company's method of conducting its business (including policies, procedures, products, improvements, software, ideas, discoveries and other intellectual property, whether patentable or copyrightable or not) conceived or made by Employee, either alone or jointly with others ("Work Product"), during Employee's employment belong to the Company. "Work Product" shall not include any Work Product that Employee developed entirely on Employee's own time without using the Company's equipment, supplies, facilities, or trade secret information, except for such Work Product that either (i) relates, at the time of conception or reduction to practice of such Work Product, to the Company's business, or actual or demonstrably anticipated research or development of the Company, or (ii) results from any work performed by Employee for the Company. Employee will promptly disclose in writing such Work Product to the Company and perform all actions reasonably requested by the Company to establish and confirm such ownership by the Company, including, but not limited to, cooperating with and assisting the Company at the Company's expense in obtaining patents for the Company in the United States and in foreign countries. Any patent application filed by Employee during the six months period following the Separation Date will be presumed to relate to an invention which was made during Employee's employment and thereafter unless Employee can provide evidence to the contrary.

8. **Cooperation**. During Employee's employment and thereafter, Employee shall cooperate fully with any litigation, investigation or inquiry by the Company or any governmental or regulatory agency or body, that relates to the Company or any member of the Company Group.

9. **Non-Competition**.

(a) Employee acknowledges that (i) the Company Business is national in scope, (ii) the Company would not have entered into this Agreement but for the covenants and agreements set forth in this Section 9, and (iii) the covenants set forth in this Section 9 are reasonable and necessary to protect the legitimate business interests of the Company, including the Confidential Information obtained by Employee during the course of Employee's employment with the Company and the Company's goodwill.  For purposes of this Agreement, "Company Business" shall mean the business of medical lien funding and any other business activities in which any member of the Company Group is engaged (or has committed plans to engage) during the Employee's employment.

(b) Notwithstanding anything herein to the contrary, during Employee's employment and for a period of time ending twelve (12) months after the Separation Date (the "Restricted Period"), Employee shall not, directly or indirectly, engage in a Competing Business, or in any other business in which the Company Group is engaged, except as an Employee or agent of the Company, and shall not, directly or indirectly, as owner, partner, joint venture, Employee, broker, agent, corporate officer, principal, licensor, shareholder (unless as owner of no more than two percent of the issued and outstanding securities of the Company with a class of securities registered under the Securities Exchange Act of 1934, as amended) or in any other capacity whatsoever, engage in or have any connection with any business which is a Competing Business, and which operates anywhere in the United States. "Competing Business" shall mean any business which, directly or indirectly, competes with the Company Business or any business engaged in by the Company or its present and then-existing affiliates as of or prior to the Separation Date.

10. **Non-Solicitation**. At all times during the Restricted Period, Employee shall not, other than on behalf of the Company, directly or indirectly (i) attempt to employ or retain or enter into any contractual or business arrangement with any current or former employee of the Company Group, (ii) employ or hire any such person, unless such person was not employed by the Company Group in the one (1) year period prior to the Separation Date, (iii) induce, influence, combine or conspire with, or attempt to induce, influence, combine or conspire with, any of the officers, employees, customers or suppliers of the Company Group to terminate or modify its employment or other relationship with the Company Group or to compete with the Company Group, and/or (iv) solicit, or attempt to solicit, any customer of the Company Group or any customer who was a customer of the Company Group at any time in the one year period prior to the Separation Date.

11. **Company Property**. Employee acknowledges and agrees that all computers, equipment, software, records, plans, manuals, guides, memoranda, lists, correspondence with customers or representatives, reports, records, charts, advertising materials, and any data and other property delivered to or acquired by Employee by or on behalf of the Company Group (including, but not limited to, any such customers obtained by Employee), and

all records compiled by Employee which pertain to the business of the Company Group shall be and remain the property of the Company Group, and be subject at all times to the discretion and control of the Company Group shall be delivered promptly to the Company by Employee upon the termination of Employee's employment or upon demand during Employee's employment.

12. **Non-Disparagement**. Employee agrees that he will not, at any time during Employee's employment and thereafter, publish or communicate to any person or entity any Disparaging (as defined below) remarks, comments or statements concerning the Company Group, and their respective parents, subsidiaries, or their respective present and former members, partners, directors, officers, shareholders, employees, agents, attorneys, successors and assigns. "Disparaging" remarks, comments or statements are those that impugn the character, honesty, integrity or morality or business acumen or abilities in connection with any aspect of the operation of business of the individual or entity being disparaged. Notwithstanding the foregoing, nothing in this Agreement shall be construed to preclude truthful disclosures in response to lawful process as required by applicable law, regulation, or order or directive of a court, governmental agency or regulatory organization.

13. **Remedies; Specific Performance**. The Company and Employee acknowledge and agree that Employee's breach or threatened breach of any of the restrictions set forth in Sections 6 through 12 may result in irreparable and continuing damage to the Company for which there may be no adequate remedy at law. Each party shall be entitled to seek equitable relief, including specific performance and injunctive relief as remedies for any breach or threatened or attempted breach of Sections 6 through 12, without requiring the posting of a bond. The parties agree that such remedies shall be in addition to any and all remedies, including damages, available to the parties for such breaches or threatened or attempted breaches.

14. **Notice of Rights and Exceptions.** Employee understands that this Agreement does not limit his ability to communicate with the Equal Employment Opportunity Commission, the National Labor Relations Board, the Occupational Safety and Health Administration, the Securities and Exchange Commission or any other federal, state or local governmental agency or commission ("Government Agencies"), including to report possible violations of federal law or regulation or making other disclosures that are protected under the whistleblower provisions of federal law or regulation, or otherwise participate in any investigation or proceeding that may be conducted by any Government Agency, including providing documents or other information, without notice to the Company. Employee will not be criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that (A) is made (i) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (B) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.

15. **Miscellaneous**.

(a) **Representations and Warranties**. Employee represents and warrants that he is not a party to or subject to any restrictive covenants, legal restrictions or other agreements in favor of any entity or person which would in any way preclude, inhibit, impair, or limit Employee's ability to enter into this Agreement or to perform his obligations under this

Agreement, including, but not limited to, non-competition agreements, non-solicitation agreements or confidentiality agreements and Employee's employment with the Company will not violate the terms of any agreement or other obligations to which Employee is subject. In connection with Employee's employment with the Company, Employee shall not use any confidential or proprietary information Employee may have obtained in connection with employment with any prior employer.

(b)     **Notices**. Any notice or other communication required or permitted under this Agreement shall be in writing and shall be considered given when delivered personally, one business day after being sent by a major overnight courier for next business day delivery, or five days after being mailed by certified mail, return receipt requested, postage prepaid, to the parties at their respective addresses first set forth above, or such other persons or such other addresses as may be designated in writing by a party to the other party in the manner provided herein for giving notice.

(c)     **Taxes**. All payments made pursuant to this Agreement will be subject to applicable withholdings for federal, state and local taxes. This Agreement is intended to comply with the requirements of Section 409A of the Code and, to the extent applicable, shall be interpreted in accordance with Section 409A of the Code to avoid any taxes thereunder. Any right to a series of installment payments pursuant to this Agreement shall be treated as a right to a series of separate payments. Any separate payment or benefit under this Agreement or otherwise shall not be deemed "nonqualified deferred compensation" subject to Section 409A of the Code to the extent provided in the exceptions in Treasury Regulation Section 1.409A-1(b)(4), Section 1.409A-1(b)(9) or any other applicable exception or provision of Section 409A of the Code. To the extent that any payments or reimbursements provided to Employee under this Agreement are deemed to constitute compensation to Employee to which Treasury Regulation Section 1.409A-3(i)(1)(iv) would apply, such amounts shall be paid or reimbursed reasonably promptly, but not later than December 31 of the year following the year in which the expense was incurred. The amount of any such payments eligible for reimbursement in one year shall not affect the payments or expenses that are eligible for payment or reimbursement in any other taxable year, and Employee's right to such payments or reimbursement of any such expenses shall not be subject to liquidation or exchange for any other benefit.

(d)     **Entire Agreement**. This Agreement contains the complete, final, and exclusive agreement of the parties with respect to the subject matter contained herein, and supersedes, terminates, and cancels all prior agreements, negotiations, correspondence, undertakings and communications of the parties, oral or written, respecting such subject matter.

(e)     **Amendments; Waivers**. This Agreement cannot be amended, modified, or supplemented unless the Company and Employee consent, in writing, to such amendment, modification, or supplement. No term, covenant or condition of this Agreement or any breach thereof shall be deemed waived, except with the written consent of the party against whom the wavier is claimed, and any waiver or any such term, covenant, condition or breach shall not be deemed to be a waiver of any preceding or succeeding breach of the same or any other term, covenant, condition or breach.

(f) **Survival**. Sections 6 through 15 shall survive the termination of Employee's employment in accordance with their respective terms.

(g) **Headings**. The headings set forth in this Agreement are for convenience of reference only and shall not be used in interpreting this Agreement. The parties acknowledge that each party and its counsel has reviewed and revised, or had an opportunity to review and revise, this Agreement, and the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement.

(h) **Governing Law**. This Agreement shall be governed in all respects, including as to validity, interpretation and effect, by the internal laws of the State of Florida, without giving effect to the conflict of laws rules thereof to the extent that the application of the law of another jurisdiction would be required thereby.

(i) **Severability**. If any one or more of the provisions of this Agreement shall be invalid, illegal, or unenforceable in any respect, the validity, legality, and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.

(j) **Arbitration**. The parties agree that any dispute, controversy or claim between the Company and Employee arising out of, relating to or concerning Employee's employment or termination thereof, other than claims that cannot be subject to mandatory arbitration as a matter of law, shall be finally settled by arbitration in the State of Florida, before and in accordance with the Employment Arbitration Rules and Mediation Procedures of the American Arbitration Association before a single arbitrator, provided that the parties may seek equitable relief from a court of competent jurisdiction pursuant to Section 13 of this Agreement; and provided further, that in the event there are claims that cannot be subject to mandatory arbitration as a matter of law, the parties agree to submit such claims to the exclusive jurisdiction of the state courts of Florida or the U.S. District Court for the Southern District of Florida and AGREE TO WAIVE THEIR RIGHT TO A JURY TRIAL. The arbitration proceedings shall be confidential. The arbitrator's award shall be final and binding upon all parties and judgment upon the award may be entered in any court of competent jurisdiction in any state of the United States. For purposes of any actions or proceedings ancillary to the arbitration referenced above (including, but not limited to, proceedings seeking injunctive or other interim relief pursuant to Section 13 of this Agreement or to enforce an arbitration award), the parties agree to submit to the exclusive jurisdiction of the state and federal courts of the State of Florida and AGREE TO WAIVE THEIR RIGHT TO A JURY TRIAL. Notwithstanding the forgoing, if Joshua Wander and Steven W. Pasko, directly or indirectly, do not own in the aggregate at least fifty percent (50%) of the Company, then any dispute, controversy or claim between the Company and Employee shall not be subject to the arbitration provisions described herein, and instead shall be resolved in a court of competent jurisdiction in the state courts of Florida or the U.S. District Court for the Southern District of Florida, with the losing party bearing the attorneys' fees and legal costs for the prevailing party.

(k) **Counterparts**. This Agreement may be executed in counterparts, each of which shall be deemed an original, and all of which counterparts shall together constitute a single agreement.

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

777 PARTNERS LLC

By: *Steven W. Pasko*
Title: *Co-Managing Partner*

SCOTT SIDELL

[SIGNATURE PAGE TO EMPLOYMENT AGREEMENT]